UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Sharon Swanson,

    Plaintiff,

v.                                                                          Civil Action No. 2:10-CV-217

Michael J. Astrue, Commissioner of
Social Security Administration,

    Defendant.

## OPINION AND ORDER
(Docs. 6 and 12)

      Plaintiff Sharon Swanson brings this action under 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are Swanson's Motion for Summary Judgment/Motion to Reverse the Decision of the Commissioner (Doc. 6), and the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Doc. 12). For the reasons set forth below, the Court GRANTS Swanson's Motion (Doc. 6), and DENIES the Commissioner's (Doc. 12).

## Background

      Swanson was born on March 21, 1948, and thus was fifty-one years old on the alleged disability onset date of December 31, 1999. (Administrative Record ("AR") 125, 129, 178, 229.) As a child, Swanson was rejected by her parents, other family members,

and at least one foster family. (AR 35-36, 162, 170.) When she was seven years old, she was placed with the State of Connecticut. (AR 35-36, 271.) On March 1, 1960, a Connecticut juvenile court placed Swanson, then eleven years old, in the Southbury Training School ("STS"), a home for persons with mental retardation. (AR 36-37, 160, 271, 576.) Swanson has completed school through only the seventh grade, and the record reflects that her mental development has been retarded since she was a child, possibly due to her childhood rejection. (AR 165, 169, 189, 279, 666, 765.) On May 14, 1969, at the age of twenty-one, Swanson was discharged from STS, approximately nine years after she was admitted. (AR 160.)

Swanson has work experience as a housekeeper and a clerk at a grocery store deli. (AR 39-40, 56, 192-94.) In 1999, her husband sustained significant injuries while working, and she was fired from her job as a deli clerk. (AR 41, 50, 271.) Since that time, she has worked part-time as an elderly companion, and has helped care for her husband, including performing basic household chores and assisting him with bathing and dressing. (AR 42, 50-56, 218, 220, 761.)

In August 2007, Swanson filed initial applications for disability insurance and supplemental security income benefits, alleging that she became unable to work on September 1, 2005. (AR 126-31.) The applications were denied due to lack of insured status and excess income, respectively. (AR 63-73, 181.) In July 2008, Swanson requested that the applications be re-opened, with an amended onset date of December 2004. (AR 76-78.) The application at issue in this case was filed on August 27, 2008, and alleges that, starting on December 31, 1999, Swanson has been unable to work due to

2

major depressive disorder, borderline personality disorder, general anxiety disorder, post-traumatic stress disorder ("PTSD"), borderline intelligence, left knee problems, and restless leg syndrome.  (AR 134-35, 183.)  Swanson claims that, as a result of these conditions, she is unable to maintain persistence, concentration, and pace; work with the general public; and complete anything more than simple tasks.  (AR 183.)

Swanson's disability application was denied initially and upon reconsideration, and she timely requested an administrative hearing, which occurred on March 3, 2010. (AR 79-85, 87-93.)  Swanson appeared and testified at the hearing, and was represented by counsel.  (AR 29-58.)  On May 20, 2010, Administrative Law Judge ("ALJ") Robert Klingebiel issued a decision finding that Swanson was not disabled under the Social Security Act at any time on or before December 31, 2004, the last date insured.  (AR 15-21.)  Thereafter, the Decision Review Board informed Swanson that it had not completed its review during the prescribed period, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1-5.)  Having exhausted her administrative remedies, Swanson filed her Complaint in the instant action on September 15, 2010.  (*See* Doc. 3.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

3

has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The fifth and final step requires the ALJ to determine whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity").

Employing this five-step analysis, ALJ Klingebiel first determined that Swanson had not engaged in substantial gainful activity since her alleged onset date of September 30, 1999.  (AR 18.)  At step two, the ALJ found that Swanson had the severe impairment of "an affective disorder."  (*Id.*)  He further found that Swanson's other impairments, including but not limited to borderline intelligence, PTSD, and borderline personality disorder, were not severe.  (*Id.*)  At step three, the ALJ found that Swanson did not have

4

an impairment or combination of impairments that met or medically equaled a listed impairment. (AR 19.) Next, the ALJ determined that Swanson had the RFC to perform "a full range of work at all exertional levels prior to December 21, 2004 but with the following nonexertional limitations: can perform simple instructions but no direct public contact." (AR 20.) At step four, the ALJ determined that Swanson is capable of performing her past relevant work as a housekeeper and a grocery-deli clerk. (AR 21.) In making this determination, the ALJ noted that Swanson's job as a deli clerk did not involve operating a cash register, and thus, "direct public contact [was] not an issue." (*Id.*) The ALJ concluded that Swanson had not been under a disability, as defined in the Social Security Act, at any time on or before December 31, 2004, the date last insured. (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded the Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

Preliminarily, the Court notes that this matter was initially presented via Swanson's "Motion for Summary Judgment." (Doc. 6.) Although the filing of a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is generally considered an appropriate procedural mechanism for seeking district court review and disposition of social security disability cases, *see, e.g., Lovett v. Schweiker*, 667 F.2d 1, 2-3 (5th Cir. 1981), this is not the recommended approach, given that (a) the motion is directed at only the pleadings, which include the administrative transcript appended to the Commissioner's answer, and (b) the role of the district court in reviewing a final decision by the Commissioner is limited to the two-prong "substantial evidence" and "legal error" standard, discussed above, which does not fit the procedures employed under Rule 56.[1] *See, e.g., Flores v. Heckler*, 755 F.2d 401, 403 (5th Cir. 1985) (noting that, because district courts in section 405(g) cases may not consider evidence outside the administrative record, summary judgment is "a problematic procedure" in disability appeals); *Igonia v. Califano*, 568 F.2d 1383, 1389 (D.C. Cir. 1977) (noting "impropriety" of using summary judgment in deciding cases under the Social Security Act); *Losco v. Heckler*, 604 F. Supp. 1014, 1016 n.1 (S.D.N.Y. 1985). Notwithstanding, the Court has considered Swanson's Motion on its merits and conducted a full review of the record under the "substantial evidence" standard discussed above.

---

[1] In the Reply, apparently acknowledging that filing a motion to reverse is the better practice, Plaintiff's counsel states that the initial motion "should have been titled as a Motion to Reverse the Decision of the Commissioner rather than a Motion for Summary Judgment." (Doc. 15 at 1 n.1.)

7

## I. ALJ's Consideration of Evidence Regarding Swanson's Alleged Impairments of Borderline Intelligence, Borderline Personality Disorder, and PTSD

Swanson argues that the ALJ erred by not properly evaluating diagnoses of borderline intelligence, borderline personality disorder, and PTSD; and by failing to find these impairments severe. Moreover, Swanson contends that the ALJ improperly relied on the opinion of non-examining agency consultant Dr. William Farrell over (a) the opinions and medical records of treating physician Dr. Richard Davis; (b) Swanson's childhood records from STS; (c) the 2009 neuropsychological evaluation conducted by Dr. Robert Roth and postdoctoral fellow Tracy Carothers; and (d) the opinions of primary care physician Dr. Francis Cook, licensed clinical mental health counselor Kammy Kelton, and licensed clinical social worker Judith Lotspeich.

With respect to the records of Dr. Davis, the neuropsychological evaluation, and the records of Dr. Cook, the Court finds that, even if the ALJ was obligated to consider them, his failure to afford much weight to them was harmless because they do not support Swanson's claim that her borderline intelligence, borderline personality disorder, and PTSD were severe during the alleged disability period. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (applying harmless error standard and holding that, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration"). Specifically, these records either (a) do not contain diagnoses of or opinions regarding whether Swanson suffered from borderline intelligence, borderline personality disorder, or PTSD; or (b) were prepared years after the date last insured and do not refer, either implicitly or explicitly, to the

8

alleged period of disability (December 1999 through December 2004), *see Vitale v. Apfel*, 49 F. Supp. 2d 137, 142 (E.D.N.Y. 1999) ("While the existence of a pre-existing disability can be proven by a retrospective opinion, such an opinion must refer clearly to the relevant period of disability and not simply express an opinion as to the claimant's current status.") (citing *Jones v. Sullivan*, 949 F.2d 57, 59-60 (2d Cir. 1991)).  (*See* AR 326-52, 724-44, 760-66, 771-87, 815-26, 828-50, 856-61, 900-04.)  Conversely, the Court finds that the other records presented by Swanson in support of her claim – including the STS childhood records and the records of treating therapists Kelton and Lotspeich – are supportive of Swanson's contention that her ability to work was significantly impaired by borderline intelligence, borderline personality disorder, or PTSD during the insured period, as discussed in detail below.  Thus, the ALJ's failure to consider these records requires remand.

### A.      Severity of Impairments

At step two of the sequential evaluation process, in assessing the severity of Swanson's borderline intelligence, borderline personality disorder, and PTSD, the ALJ noted merely that these "alleged problems," like all of Swanson's other impairments other than "an affective disorder," had not caused significant limitations in Swanson's ability to perform basic work activities, and thus were not severe.  (AR 18.)  The ALJ did not refer to any particular evidence to support this finding.  In fact, the only medical evidence cited in the severity-assessment portion of the ALJ's decision are Dr. Cook's "notes of office visits."  (*Id.*)  These notes, however, as described by the ALJ himself, do not relate to Swanson's alleged mental impairments, including borderline intelligence,

9

borderline personality disorder, or PTSD; but rather, address Swanson's physical problems, including "red eye, dysuria, irritable bowel syndrome, obesity, restless legs, an eyelid rash, eczema, gastrointestinal reflux disease, dermatitis, sinusitis, status post-sexual assault, insomnia, hormone replacement therapy, diarrhea, dry heaves[,] and bursitis."  (*Id.* (citing AR 325-52).)

The claimant bears the burden at step two of the sequential process of providing medical evidence demonstrating the severity of his or her condition.  *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Burgos v. Astrue*, No. 3:09-cv-1216 (VLB), 2010 WL 3829108, at *3 (D. Conn. Sep. 22, 2010).  Specifically, it is the claimant's burden to establish that his or her impairment "significantly limit[s] [his or her] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a); *see* 20 C.F.R. § 404.1520(c).  The Second Circuit has held, however, that the step two severity assessment "may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)).  To that end, Social Security Ruling ("SSR") 85-28 provides:  "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., *do not have more than a minimal effect on the [claimant's] physical or mental ability(ies) to perform basic work activities*."  SSR 85-28, 1985 WL 56856, at *3 (1985) (emphasis added).  The opinion further states:

> [A]t the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any [substantial gainful activity].  *An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made*

10

>   *at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work* even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). . . .

*Id.* (emphasis added) (citing 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), 416.921); *see also* SSR 96-3p, 1996 WL 374181, at *1 (Jul. 2, 1996).

For the reasons explained below, the Court finds that, had the ALJ considered Swanson's childhood records from STS (AR 160, 279) and treatment records from mental health counselor Kammy Kelton (AR 582, 666) and social worker Judith Lotspeich (AR 357, 486-89, 668), it is likely that he would have found Swanson's borderline intelligence, borderline personality disorder, or PTSD to have been severe, i.e., to have caused more than "a slight abnormality or a combination of slight abnormalities which . . . ha[d] more than a minimal effect on [Swanson's] ability to work" during the insured period.  SSR 85-28, at *3.  Therefore, the matter must be remanded for a re-evaluation starting at step two of the ALJ's sequential evaluation.

        **1.**    **STS Childhood Records**

The STS records discuss Swanson's history of neglect and rejection, and contain diagnoses of borderline retardation and neurotic tendencies.  (*See* AR 160, 165, 279.) Specifically, in a 1961 "Medical Summary," clinical psychologist Dr. Gail Butterfield and Director of Psychological Services Dr. C. Edward Stull noted Swanson's history of "[i]nstitutional supervision and training," and diagnosed her with "Borderline retardation" and "Neurotic tendencies (insecurity, anxiety)."  (AR 279.)  The Summary

11

explained that Swanson "shows a tendency toward having neurotic maladjustment difficulties.  She is an insecure young girl, probably because of the fairly obvious rejection from her mother and because of a series of apparently undesirable foster home experiences."  (*Id.*)

In an earlier summary, which was apparently prepared for STS when Swanson was in the second grade and was based on information provided by the State Welfare Department (Child Welfare), it was noted that "[Swanson's] mental development has been consistently retarded and it is difficult to assess how much of this is due to emotional disturbance and rejection."  (AR 165.)  The report further stated that Swanson's "school accomplishment is [b]orderline and it appears that special help is needed," and that, "[i]n the school setting[, Swanson's] achievement is slow and she is easily distracted and there is some attention-getting behavior."  (AR 163, 165.)  The report noted three psychological examinations completed by Swanson in the years 1953, 1954, and 1956, and explained that, with each examination, "borderline defective was the general classification rendered. . . .  [Swanson's] ability to conform, reason and understand what is expected of her is extremely limited as well."  (AR 165.)

Although these records were prepared decades prior to Swanson's alleged disability onset date, they are at least relevant to the severity of Swanson's alleged mental impairments, including borderline intelligence, borderline personality disorder, and PTSD, during the relevant period.  This is especially true, considering the following more recent, corroborative evidence: (a) records from two mental health providers diagnosing Swanson with borderline personality disorder, low cognitive abilities, and PTSD in 2007

12

and 2008 (*see* AR 486, 582, 666, 668, discussed in detail below); and (b) the 2009 neuropsychological evaluation of Dr. Roth and Carothers, which estimates Swanson's "overall intellectual functioning" to be "in the borderline range," and states that Swanson tested in the "low average range" for performance on a measure of picture vocabulary, in the "mildly impaired range" for performance on a measure requiring identification of missing elements from a picture, and in the "extremely low range" for mathematical abilities; and indicates that her "[c]ognitive flexibility was impaired" (AR 764-65).

## 2. Kammy Kelton Records

The ALJ also should have considered the records of licensed clinical mental health counselor Kammy Kelton in determining the severity of Swanson's mental impairments. Kelton treated Swanson from October 2006 through September 2007, and in October 2008, provided a "Treatment Summary" with respect to the treatment provided. (AR 666.) Therein, Kelton listed as one of Swanson's diagnoses "Borderline personality disorder." (*Id.*) She stated that Swanson "reported a history of abuse, neglect[,] and severe rejection from her parents and siblings"; and "was in foster care as a child[,] and as a teen was placed in a state receiving home for mentally retarded adolescents . . .[, which] history has had a significant impact on [Swanson's] mental health and functioning." (*Id.*) Additionally, approximately one year earlier, in August 2007, Kelton opined that "[s]ignificant trauma history, current stressors and lower cognitive abilities are affecting [Swanson's] ability to function at work and with daily tasks." (AR 582.) Although Kelton did not treat Swanson during the alleged disability period, and her opinions about Swanson were rendered over two years after the date last insured,

Kelton's 2008 Summary includes a retrospective component, stating that, "[g]iven [Swanson's] childhood history and the ongoing stressors of caring for her disabled husband, it is likely that her depression and borderline functioning *have been present for many years*."  (AR 666 (emphasis added).)

The ALJ's failure to reference Kelton's opinion constitutes clear error.  *See, e.g., Pagan v. Chater*, 923 F. Supp. 547, 556 (S.D.N.Y. 1996) (holding that, although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, the court cannot accept an unreasoned rejection of relevant evidence, and "[t]he ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error").  As a mental health counselor, Kelton was not an "acceptable medical source," and thus the treating physician rule does not apply to her opinions.  20 C.F.R. § 416.913(a).  Nonetheless, the ALJ should have at least acknowledged Kelton's diagnosis of borderline personality disorder and her connection of Swanson's borderline functioning and low cognitive ability to Swanson's childhood.  SSR 06-03p provides guidance regarding how ALJs should handle opinions from sources other than "acceptable medical sources," including licensed clinical social workers and therapists:

> In addition to evidence from "acceptable medical sources," we may use evidence from "other sources" . . . to show the severity of the individual's impairment(s) and how it affects the individual's ability to function.  These sources include, but are not limited to . . . licensed clinical social workers . . . and therapists . . . .
>
> . . .
>
> *Opinions from these [other] sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional*

14

*effects, along with the other relevant evidence in the file.*

SSR 06-03p, 2006 WL 2329939, at *2, *3 (Aug. 9, 2006) (emphasis added); *see also Marziliano v. Sullivan*, 771 F. Supp. 69, 75 (S.D.N.Y. 1991) (although the opinion of an "other source" does not command the same weight as a treating physician's opinion, it is entitled to "some consideration").

SSR 06-03p further directs ALJs to use the same factors for the evaluation of "other sources," such as social workers and therapists, as are used to evaluate the opinions of "acceptable medical sources," including treating physicians. *Id.* at *4; *see also* 20 C.F.R. § 404.1527(d). Despite this authority, the ALJ utterly failed to explain his decision to disregard Kelton's opinions. It is not even clear from the ALJ's opinion if he was aware of these opinions. Although the ALJ was free to conclude that Kelton's opinions were not entitled to any weight, he should have stated and explained that decision. *See, e.g., Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010). Where, as here, the record does not reveal whether and to what extent the ALJ considered "some of the more important evidence presented," the case must be remanded because the Court cannot fulfill its duty to determine whether the decision was rendered in accordance with the law. *Carnevale v. Gardner*, 393 F.2d 889, 891 (2d Cir. 1968).

### 3. Judith Lotspeich Records

For the same reasons, the ALJ also should have considered the records of licensed clinical social worker Judith Lotspeich in determining the severity of Swanson's mental impairments. Lotspeich treated Swanson from October 2007 through October 2008. In July and September 2008, respectively, she diagnosed Swanson with PTSD and

15

borderline personality disorder. (AR 505.) In November 2008, Lotspeich added generalized anxiety disorder including "Overanxious Disorder of Childhood" to Swanson's diagnoses. (AR 668.) On the same date, Lotspeich recommended that Swanson begin "a more intense, higher level of treatment than individual outpatient therapy," and noted among other things Swanson's "[c]omplex trauma history and diagnosis." (*Id.*)

The Court finds that these records from social worker Lotspeich, in conjunction with the records from mental health counselor Kelton and the childhood records from STS, support a finding that Swanson's borderline intelligence, borderline personality disorder, and PTSD had more than a minimal effect on her ability to do basic work activities during the insured period. Therefore, the ALJ should have considered and discussed them in determining the severity of Swanson's impairments.

The Commissioner argues that any error the ALJ may have made at step two of the sequential evaluation process was harmless because the ALJ found another impairment severe and thus proceeded to the next step. It is true that, in general, an ALJ's omission of an explicit finding of a step two impairment or limitation where substantial evidence supports the presence of such impairment or limitation, does not in and of itself require remand. *See, e.g., Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003). However, this rule applies only in cases where the omitted impairment or limitation was accounted for in the ALJ's RFC determination, or in other words, where the ALJ's step-two error did not prejudice the claimant at later steps in the sequential evaluation process. *See, e.g., Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir.

2007) (finding that any error ALJ committed in failing to list plaintiff's bursitis at step two was harmless, because the ALJ "extensively discussed" the bursitis and "considered any limitations posed by [it] at [s]tep 4"); *Elliott v. Comm'r of Soc. Sec.*, No. 09-1195-HA, 2011 WL 1299623, at *4 (D. Or. Mar. 31, 2011) ("The general proposition that failures at step two may be harmless *if the ALJ discusses the impairments and assesses limitations as a result of that impairment*, . . ., underscores the significance of the error in this case—the ALJ failed to adequately discuss the impairments at issue, and a determination as to whether plaintiff's limitations were fully assessed in connection with these impairments is impossible to ascertain.") (emphasis added); *Sarver v. Comm'r of Soc. Sec.*, No. 07-11597, 2008 WL 3050392, at *14 n.7 (E.D. Mich. Jul. 28, 2008) ("Admittedly, in some instances an improper Step Two omission serves to invalidate the entire decision."). Here, there is no indication that the ALJ considered Swanson's borderline intelligence, borderline personality disorder, and PTSD in assessing her RFC, or at any other stage in the sequential evaluation process. Therefore, the Court cannot conclude that Swanson was not prejudiced by the ALJ's step two error, and finds that the error was not harmless.

    **B.**    **RFC Determination**

Although Swanson does not specifically challenge the ALJ's RFC determination, she argues that the ALJ erred in assigning significant weight to Dr. Farrell's opinion, and the ALJ analyzes that opinion only in the context of his RFC determination (*see* AR 20). Therefore, the ALJ's RFC determination, in addition to his assessment of the severity of Swanson's impairments, is encompassed within Swanson's argument to the Court. For

the same reasons stated above, the Court finds that the ALJ erred in failing to consider all relevant evidence with respect to his RFC determination.

Residual functional capacity ("RFC") is defined as: "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Given the ALJ's failure to consider the records from STS, mental health counselor Kelton, and social worker Lotspeich in determining the severity of Swanson's mental impairments or at any other stage in the sequential analysis, the ALJ could not have accurately determined what Swanson was able to do, despite those impairments, during the alleged disability period. Moreover, the Court finds that the ALJ's RFC determination is flawed due to its substantial reliance on the opinion of agency consultant Dr. Farrell, who does not appear to have reviewed the childhood records from STS or the records of treating therapists Kelton and Lotspeich.[2] (*See* AR 674-91.) At a minimum, the strength of Dr. Farrell's opinion is diminished due to his failure to include reference therein to these records, which the Court has found to be significant.[3]

## II.   "Past Relevant Work"

Swanson's final argument is that the ALJ erred in finding she could perform her past relevant work as a housekeeper and a grocery-deli clerk. (*See* AR 21.) Specifically, Swanson contends that the ALJ should have obtained testimony from a vocational expert

---

[2] Dr. Farrell did, however, note that Swanson completed school through only the seventh grade (AR 686, 691) and attended a "training school" (AR 686).

[3] The Court rejects Swanson's contention that the ALJ erred in affording more weight to Dr. Farrell's opinion than to Dr. Davis's. As the Commissioner points out, Dr. Davis's opinion overlaps with that of Dr. Farrell in many respects, and may even assess Swanson's impairments as being *less* limited than Dr. Farrell's. (*Compare, e.g.,* AR 688-89 with AR 852-53.)

("VE") before deciding whether she was able to perform these jobs. Given the above finding that remand is required to correct the ALJ's severity and RFC determinations, the Court need not decide this issue. However, it is worth noting that, given the ALJ's extreme nonexertional limitation that Swanson was able to have "*no* direct public contact" (AR 20), the ALJ should have either contacted a VE or questioned Swanson at the administrative hearing about whether "direct public contact" was required in her housekeeper and grocery-deli clerk jobs. Although Swanson stated in a Work History Report that she "did not use a cash register" in the deli clerk job (AR 194), she still could have had direct contact with the public in that job. Moreover, common sense dictates that the jobs of supermarket deli clerk and housekeeper, in general, involve some level of contact with the public, though that contact may be minimal.

## Conclusion

For the above reasons, Swanson's Motion (Doc. 6) is GRANTED, and the Commissioner's Motion (Doc. 12) is DENIED. Accordingly, the Court reverses the decision of the Commissioner and remands under sentence four of 42 U.S.C. § 405(g) for further proceedings in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 29th day of June, 2011.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge